# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

RANDY JOE CHANCE,

                              Plaintiff,

    vs.

NANCY A. BERRYHILL, Deputy
Commissioner of Social Security for Operations,

                              Defendant.

Case No. 3:18-cv-00019-SLG

## DECISION AND ORDER

On or about March 27, 2014, Randy Joe Chance protectively filed an application for Disability Insurance Benefits ("disability benefits") under Title II of the Social Security Act ("the Act"), alleging disability beginning January 19, 2012.[1]  Mr. Chance later amended his alleged onset date to January 29, 2014.[2]  Mr. Chance has exhausted his administrative remedies and filed a Complaint seeking relief from this Court.[3]

On May 7, 2018, Mr. Chance filed an opening brief.[4]  The Commissioner filed an Answer and a brief in opposition to Mr. Chance's opening brief.[5]  Mr. Chance filed a notice of no reply on June 19, 2018.[6]  Oral argument was not requested and was not necessary

---

[1] Administrative Record ("A.R.") 22, 100, 220.  The actual filing date was April 8, 2014.  A.R. 220.

[2] Mr. Chance amended the alleged onset date at the hearing before ALJ Hebda on January 23, 2015.  A.R. 22, 52.  The date last insured was December 31, 2017.  A.R. 22.

[3] Docket 1 (Compl.).

[4] Docket 13 (Chance's Opening Br.).

[5] Docket 10 (Answer); Docket 14 (Def.'s Br.).

[6] Docket 15 (Chance's Notice Regarding Reply Br.).

to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[7]  For the reasons set forth below, Mr. Chance's request for relief will be denied.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[8] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[10]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[11]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[12]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination

---

[7] 42 U.S.C. § 405(g).

[8] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[9] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[10] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[11] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[12] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

and "may not affirm the ALJ on a ground upon which she did not rely."[13] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[14]

## II. DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[15] In addition, SSI may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[16] Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[17]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work

---

[13] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[14] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[15] 42 U.S.C. § 423(a).

[16] 42 U.S.C. § 1381a.

[17] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[18]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[19] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[20] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[21] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert ("VE"), *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[22] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity." *The ALJ concluded that Mr. Chance "did not engage in substantial gainful activity since January 29, 2014, the alleged onset date."[23]*

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical

---

[18] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[19] 20 C.F.R. §§ 404.1520(a)(4).

[20] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[21] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[22] *Tackett*, 180 F.3d at 1101.

[23] A.R. 24.

or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the twelve-month duration requirement. *The ALJ determined that Mr. Chance had the following severe impairments: "degenerative disk and facet disease of the lumbar spine, bilateral lumbar pars defects at L5, and history of right knee chondromalacia (status-post arthroscopic chondroplasty)." ALJ Hebda determined that although Mr. Chance had diagnoses of "mild chronic spondylosis and mild chronic T8 and T9 foreshortening and wedging, mild degenerative spurring of the right elbow and history of tendinopathy, hypertension, mild obesity (BMI of less than 32kg/m²), and testosterone deficiency," none of those impairments were severe. Additionally, the ALJ determined that Mr. Chance's alleged left knee pain was not a medically determinable impairment.*[24]

**Step 3.** Determine whether any impairment or combination of impairments is the equivalent of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1 that are so severe as to preclude substantial gainful activity. If any such impairment(s) is the equivalent of any of the listed impairments, and meets the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step. *The ALJ determined Mr. Chance did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.*[25]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC

---

[24] A.R. 24–25.

[25] A.R. 25.

assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[26] *The ALJ concluded that Mr. Chance had the RFC to perform light work, but would be additionally limited to "only frequent pushing/pulling with left lower extremity; only frequent climbing of ramps or stairs; only occasional climbing of ladders, ropes, or scaffolds; only occasional stooping, kneeling, crouching, and crawling; only occasional repetitive overhead work with the left upper extremity (non-dominant); the avoidance of concentrated exposure to excessive vibration and unprotected heights; and a sit/stand option allowing individual to alternate sitting or standing positions throughout the day."[27]*

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do his past relevant work, the claimant is deemed not to be disabled. Otherwise, the evaluation process moves to the fifth and final step. *The ALJ found that Mr. Chance was unable to perform any past relevant work.[28]*

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled. *Based on the testimony of the VE, the ALJ concluded that there were jobs that*

---

[26] 20 C.F.R. § 404.1520(a)(4).

[27] A.R. 26.

[28] A.R. 34.

*existed in significant numbers in the national economy that Mr. Chance could perform, including the positions of cashier II, storage rental clerk, and order caller.*[29]

Based on the foregoing, the ALJ concluded that Mr. Chance was not disabled from January 29, 2014, the alleged onset date, through January 26, 2016, the date of the ALJ's decision.[30]

### III. PROCEDURAL AND FACTUAL BACKGROUND

Mr. Chance was born in 1962; he is currently 56 years old.[31] From approximately September 1997 to September 2012, he worked as a commercial-industrial HVAC/refrigeration mechanic.[32] He briefly worked as a HVAC coordinator/maintenance inspector in January 2014.[33] Mr. Chance initiated his application for disability benefits on or about March 27, 2014; his amended onset date is January 29, 2014.[34] On July 31, 2014, the SSA field office found Mr. Chance not disabled.[35] Mr. Chance requested an administrative hearing on August 21, 2014.[36] On January 23, 2015, Mr. Chance testified

---

[29] A.R. 35.

[30] A.R. 35–36.

[31] A.R. 220.

[32] A.R. 59, 272–78.

[33] Mr. Chance reported working as a HVAC coordinator/inspector from January 15, 2014 to January 28, 2014. A.R. 256. For that reason, he amended the onset date to January 29, 2014. A.R. 52.

[34] A.R. 22, 100, 220. *See supra* notes 1, 2.

[35] A.R. 104.

[36] A.R. 109.

at a hearing before ALJ Paul Hebda in Anchorage, Alaska with an attorney. At that hearing, Mr. Chance's attorney requested a supplemental hearing prior to the vocational expert's testimony.[37] The supplemental hearing took place on December 22, 2015, at which VE Raymond North testified.[38] The ALJ issued an unfavorable decision on January 26, 2016.[39] The Appeals Council denied Mr. Chance's request for review on April 19, 2017.[40] Mr. Chance timely appealed to this Court; he is represented by counsel in this appeal.[41]

*The Medical and Vocational Records*

The following is in the administrative record:

On December 20, 2011, Mr. Chance visited Michele Prevost, M.D., at Denali Orthopedic Surgery. He reported a right knee injury due to slipping on ice on December 5, 2011. Dr. Prevost noted that the MRI of his knee was "a fairly grainy study." On physical examination, Dr. Prevost observed that Mr. Chance ambulated with a "slight antalgic gait, but [was] full weightbearing" and "had no difficulty climbing on and off the exam table." He had equal range of motion, no rotational instability, and no edema distally, but the right knee had a "1+ to 2 effusion without any capsular warmth, erythema or irritability" and he lacked "the last 10 degrees of flexion due to pain in the popliteal fossa." She

---

[37] A.R. 77–78.

[38] A.R. 83–87.

[39] A.R. 19, 22–36.

[40] A.R. 4.

[41] Docket 1, 13.

recommended more time and rest.[42]  Dr. Prevost also completed a physician's report for workers' compensation on December 20, 2011.  She opined that Mr. Chance should be limited to light duty and needed to "avoid squatting, kneeling or twist pivot" with his right knee for approximately one month.[43]

On January 17, 2012, Mr. Chance followed up with Dr. Prevost.  He reported continuing right knee pain "when he kneels or puts any type of significant pressure against his knee, especially squatting."  On physical examination, Dr. Prevost observed that Mr. Chance still had "a trace effusion without any warmth or erythema," with full extension, but not the hyperextension seen on the left side.  She observed that Mr. Chance had no joint line tenderness or patellofemoral compression tenderness.  His gait was normal.  Dr. Prevost scheduled Mr. Chance for diagnostic arthroscopic surgery.[44]  Dr. Prevost completed a second workers' compensation physician's report and opined that Mr. Chance should continue with light duty with "no changes until surgery."[45]

On January 20, 2012, Mr. Chance visited Dr. Prevost.  He reported reinjuring his right knee at work.  On physical examination, Dr. Prevost observed trace effusion and tenderness of his medial plica, but his "[l]igaments, anterior drawer, Lachman, posterior drawer, varus and valgus were all stable."  She noted good endpoints and no instability, discoloration, or edema.  She denied Mr. Chance's request for a handicap parking sticker

---

[42] A.R. 428–29.

[43] A.R. 449.

[44] A.R. 459–60.

[45] A.R. 448.

until after surgery.[46]  In a worker's compensation report, Dr. Prevost recommended that Mr. Chance work at a desk job until after his surgery.[47]

On February 16, 2012, Mr. Chance had right knee arthroscopy "with a limited abrasion chondroplasty, medial femoral condyle, and a medial plicectomy/synovectomy." Dr. Prevost anticipated "progressed activities as tolerated but with his occupation estimate 6 weeks probably before he will be able to return to work."  She recommended ice and anti-inflammatories "to try to prevent recurrence of that medial plica synovitis."[48]

On March 2, 2012, Mr. Chance followed up with Dr. Prevost.  He reported "doing pretty well," but also reported knee swelling "a couple of days ago."  On physical examination, Dr. Prevost noted 1+ effusion and five degrees from full extension of the knee.[49]  Dr. Prevost completed a physician's report opining that because Mr. Chance had reported that no light duty option was available for him with his employer, he was not released for work at that time.[50]

On March 20, 2012, Mr. Chance followed up with Dr. Prevost.  He reported "a bit of soreness, throbbing at night, making it difficult to sleep."  Dr. Prevost noted that his quadriceps were deconditioned and he was "starting to get a little bit of a flexion contracture of about 5 degrees."  She also noted that his pain was "a little bit out of

---

[46] A.R. 457–58.

[47] A.R. 447.

[48] A.R. 430–34.

[49] A.R. 455.

[50] A.R. 445.

proportion." She denied his requests for narcotic pain medications, but prescribed an anti-inflammatory; she made a referral for physical therapy.[51] Dr. Prevost's physician's report stated Mr. Chance was not released for work, as he was recovering slowly with "weak quads" and was "developing flexion contracture."[52]

On April 2, 2012, Mr. Chance established care with First Choice Physical Therapy. He reported right knee pain and leg weakness with poor mobility. A treatment plan of physical therapy three times a week for six weeks was started. Dr. Prevost signed the treatment plan and indicated that Mr. Chance's prognosis was "good."[53]

From April 4 to April 23, 2012, Mr. Chance saw Jeff LePage, P.T., on a number of occasions for physical therapy to address his right knee pain. At the April 23rd session, PT LePage opined that Mr. Chance's right knee pain was "down" and he had "gained motion and some strength." He opined that Mr. Chance demonstrated excellent rehabilitation potential due to the progress that had been made so far, but that he was "not able to work right now." PT LePage recommended continued physical therapy.[54]

On April 24, 2012, Mr. Chance followed up with Dr. Prevost. He reported anterior knee pain, but also noted that physical therapy had been "helping quite a bit." Dr. Prevost noted that Mr. Chance was "doing fairly well except for the onset of a patellofemoral

---

[51] A.R. 359.

[52] A.R. 444.

[53] A.R. 354–56.

[54] Mr. Chance attended physical therapy sessions on April 4, 6, 9, 11, 13, 16, 18, 20, and 23, 2012. A.R. 360–80.

syndrome."[55]  She noted no apparent damage to the cartilage under the knee cap and opined "this is just one of those unusual cases of anterior knee pain postoperatively that is probably related more to tight hamstrings and weak quadriceps than anything else." On the workers' compensation form completed that same day, Dr. Prevost recommended continued physical therapy.  She released him to work on a light duty option, but noted that Mr. Chance had verbally reported this option was not available to him.[56]

From April 25 to May 25, 2012, Mr. Chance attended additional physical therapy sessions with PT LePage.[57]

On May 25, 2012, Mr. Chance followed up with Dr. Prevost.  He reported improvement with physical therapy "getting his quadriceps muscles to return, which is decreasing the anterior knee pain," but that he was having pes anserine pain.  Dr. Prevost noted "slower than average" progress, but that Mr. Chance "finally seem[ed] to be making it."[58]  She indicated, "we are setting a goal that he gets back to his full commercial refrigeration duties, based on the work descriptions that were provided to us, in another three months."  On the workers' compensation physician form, Dr. Prevost continued to release Mr. Chance to light duty work only, with continued physical therapy to achieve work conditioning and hardening.[59]

---

[55] A.R. 453.

[56] A.R. 443.

[57] Mr. Chance attended physical therapy sessions on April 25, 27, and 30, 2012 and May 2, 4, 7, 9, 11, 14, 16, 18, 21, 23, and 25, 2012.  A.R. 381–411.

[58] A.R. 452.

[59] A.R. 442.

On May 30, 2012, Mr. Chance saw PT LePage for physical therapy and stated he "underst[oo]d that I need to get ready for work." But at his next visit on June 7, 2012, Mr. Chance indicated he was "confused about what I am supposed to be doing." After multiple cancellations and no-shows, Mr. Chance was discharged as a physical therapy patient at First Choice Physical Therapy on June 22, 2012.[60]

On June 14, 2012, Mr. Chance established care with Michael Wellsandt, P.T., at Excel Physical Therapy. He reported right knee pain and weakness and "difficulty straightening the knee." PT Wellsandt observed a mild to moderate antalgic gait with "decreased stance time" on the right and decreased knee flexion.[61]

On June 18 and June 22, 2012, Mr. Chance saw PT Wellsandt for physical therapy for his right knee.[62]

On June 26, 2012, Mr. Chance followed up with Dr. Prevost. He reported increased anterior right knee pain with the increased physical therapy. On physical examination, Dr. Prevost observed that Mr. Chance was able to "get full extension" of his right knee and had no effusion. Dr. Prevost noted Mr. Chance's post-operative recovery was "a much longer recovery than typical for this surgery" and that she suspected "some symptom magnification [was] present."[63] She indicated that if Mr. Chance was unable to

---

[60] A.R. 412–13, 417–18, 424–25. Mr. Chance cancelled or did not show at appointments on May 31, June 5, June 6, June 11, June 12, June 13, June 14, and June 15, 2012. A.R. 414–16, 419–23.

[61] A.R. 466–68, 505.

[62] A.R. 503–04.

[63] A.R. 451.

return to his prior job within six months post-operatively (i.e. August 2012), "then order a permanent partial impairment and recommend return-to-work cross-training." She continued to limit him to light duty with no squatting, kneeling, climbing ladders, scaffolding, or lifting greater than 20 pounds from the ground level.[64]

From June 25 to July 26, 2012, Mr. Chance continued to attend physical therapy sessions for his right knee at Excel Physical Therapy.[65]

On July 31, 2012, Mr. Chance followed up with Dr. Prevost. On physical examination, Dr. Prevost observed an active full straight leg raise equal to the other leg, but a "palpable deficit as far as the girth, bulk, and just overall quadriceps muscles." She noted normal patellar tracking and normal limb alignment. She stated she did "not have a good explanation for his long recovery," and noted "active-duty military, parachute-jumpers, and athletes are back to full duty at this point." Dr. Prevost opined that Mr. Chance "should be ready to go back to work," but she had to "honor his verbal report that he does not feel he can do so at this time." She indicated that "[f]rom a medical standpoint, there really is no further treatment after this final cycle of [physical] therapy."[66]

From August 1 to September 6, 2012, Mr. Chance went to Excel Physical Therapy for his right knee pain.[67]

---

[64] A.R. 441.

[65] Mr. Chance attended physical therapy sessions on June 25 and 28, 2012 and July 2, 3, 5, 10, 11, 12, 18, 20, 25, and 26, 2012. A.R. 490–502.

[66] A.R. 450.

[67] Mr. Chance attended physical therapy sessions on August 1, 3, 8, 9, 16, 17, 21, 22, 28, and 29, 2012 and September 6, 2012. A.R. 479–89.

On September 10, 2012, Mr. Chance saw Shawn Johnston, M.D., at Alaska Spine Institute for a permanent partial impairment rating. Dr. Johnston opined that Mr. Chance had a 2% lower extremity impairment based on his right knee pain and mild loss of range of motion, which converted to a "1% whole person impairment for the plica and injury to the medial femoral condyle."[68]

On September 20, 2012, Mr. Chance saw Robert Hall, M.D., at Orthopedic Physicians Anchorage ("OPA"), for a second opinion. On physical examination, Dr. Hall observed that Mr. Chance walked with an antalgic gait, but his right knee had healed well with no "significant effusion." The right knee was stable to stress testing with some mild tenderness. X-rays showed no degenerative change and no joint space narrowing in the right knee with the patella "well centered."[69] Mr. Chance also had a right knee MRI on September 20, 2012. The MRI showed a "small defect in cartilage involving the medial patellar facet" with an "associated soft tissue change . . .which may represent granulation tissue" and a "small defect in cartilage overlying the medial femoral condyle." The study was otherwise unremarkable.[70]

On September 22, 2012, Mr. Chance was examined by Douglas Bald, M.D., at the request of his employer's worker's compensation insurer "for the purpose of trying to determine whether any further treatment of any kind is reasonable or appropriate or necessary directed towards Mr. Chance's right knee condition." Mr. Chance reported pain

---

[68] A.R. 461–63.

[69] A.R. 751–53.

[70] A.R. 754.

and "grinding" in his right knee, "particularly associated with any kind of stair climbing, either going up or down, or with prolonged weightbearing." Dr. Bald diagnosed Mr. Chance with right knee sprain/strain and persistent patellofemoral tracking dysfunction. He opined that Mr. Chance was "not yet medically stable or stationary," as "his right knee condition could be improved significantly with further treatment," including more physical therapy, "perhaps in conjunction with a muscle stimulator." Dr. Bald opined that it was premature to determine whether Mr. Chance had any permanent physical restrictions, and that he was capable at that time of performing light/medium work limited to occasional lifting or carrying up to 35 pounds with no squatting, kneeling, or ladder climbing.[71]

On October 1, 2012, Mr. Chance saw Dr. Hall to discuss the September 2012 MRI. He reported unchanged anterior knee pain and some posteromedial pain. Dr. Hall reviewed Mr. Chance's MRI results and diagnosed him with right knee peri-meniscal cyst and possible patella articular cartilage damage, but no meniscal tear.[72]

On October 9, 2012, on Dr. Hall's recommendation, Mr. Chance had an ultrasound-guided medial cyst aspiration on his right knee. Although "[t]echnically successful," only minimal fluid was aspirated.[73]

On October 12, 2012, Mr. Chance followed up with Dr. Hall. He reported that after the medial cyst aspiration, "the posteromedial pain went away" but the anterior knee pain persisted. Dr. Hall opined that Mr. Chance could "live with [the knee] the way it is or

---

[71] A.R. 614–23.

[72] A.R. 750.

[73] A.R. 712.

consider a second surgery for an arthroscopy evaluation in the medial meniscus." Mr. Chance indicated he wanted to proceed with the surgery.[74]

On October 30, 2012, Mr. Chance underwent "right knee arthroscopic limited chondroplasty of the medial facet of the patella and the medial femoral condyle" and "[o]pen removal of posterior medial cyst, right knee." No tearing of the meniscus was noted.[75]

On November 1, 2012, Mr. Chance had deep vein thrombosis testing on his right leg based on a reported history of "[a]cute right leg pain and swelling following recent knee surgery." The examination was normal with "no evidence for deep vein thrombosis."[76]

On November 7, 2012, Mr. Chance saw Raymond Farrell, P.A., at OPA. On physical examination he had 90 degrees of motion in the right knee and no evidence of erythema or drainage.[77] PA Farrell also completed a disability work status form opining that Mr. Chance was "totally disabled," but able to return to work on December 1, 2012.[78]

From November 19, 2012 to November 29, 2012, Mr. Chance went to physical therapy at Health Quest Therapy for his right knee.[79]

---

[74] A.R. 749.

[75] A.R. 757–59.

[76] A.R. 756.

[77] A.R. 747.

[78] A.R. 862.

[79] Mr. Chance attended physical therapy sessions on November 19, 27, and 29, 2012. A.R. 525–29.

On November 30, 2012, Mr. Chance visited Dr. Hall. He reported some significant pain, although improved since directly after the recent surgery. Dr. Hall noted "some decreased sensation" around Mr. Chance's surgical incision, but also noted no significant effusion.[80]

From December 4, 2012 to December 27, 2012, Mr. Chance continued physical therapy for his right knee.[81]

On December 31, 2012, Mr. Chance followed up at OPA. He reported doing well and improving until aggravating his knee at physical therapy. On physical examination, positive patella crepitation, mild medial jointline tenderness, 115 degrees range of motion, and an active straight leg raise were observed.[82]

Through January 2013, Mr. Chance went to physical therapy for his knee at Health Quest Therapy.[83]

On February 4, 2013, Mr. Chance followed up with Dr. Hall. He reported that he "feels he is close to being ready to go back to work." Dr. Hall noted that Mr. Chance's range of motion was 0 to 130 degrees and the medial jointline and posterior aspect of the

---

[80] A.R. 746.

[81] Mr. Chance attended physical therapy sessions at Health Quest on December 4, 6, 11, 20, 21, and 27, 2012. A.R. 531–42.

[82] A.R. 745.

[83] Mr. Chance attended physical therapy sessions on January 3, 4, 8, 10, 15, 22, and 24, 2013 and February 1, 2013. A.R. 543–58.

knee were nontender. Dr. Hall stated, "hopefully [in another four to six weeks], we can return him to work."[84]

From February 5 to March 5, 2013, Mr. Chance visited Health Quest on multiple occasions for physical therapy on his right knee.[85]

On March 7, 2013, Mr. Chance followed up with Dr. Hall. Mr. Chance reported improvement with physical therapy, but that he was "still unable to squat or kneel." He also reported that he was "not taking any pain medications of any kind anymore" and that he had "no more flares of his symptoms." On physical examination, Dr. Hall noted that Mr. Chance had "some numbness in the anterolateral shin," but that he was "neurovascularly intact around that incision."[86]

On March 8 and March 21, 2013, Mr. Chance went to physical therapy for his right knee.[87]

On March 26, 2013, Mr. Chance went to the emergency department at Mat-Su Regional Medical Center. He had been involved in a three-car motor vehicle accident that the ER notes describe as "relatively low-speed" impact with no airbag deployment; Mr. Chance was wearing his seat belt and was "complaining of low back pain, lower leg pain, and elbow pain," but was ambulatory at the scene. X-rays of Mr. Chance's thoracic spine, chest, and right elbow and CT scan of the chest, abdomen, and pelvis did not show

---

[84] A.R. 744.

[85] Mr. Chance attended physical therapy sessions on February 5, 7, 13, 14, 19, 26, and 28, 2013 and March 5, 2013. A.R. 559–74.

[86] A.R. 743.

[87] A.R. 575–78.

any acute fracture, dislocation, or instability.  X-rays did show "[c]hronic mild spondylosis and chronic mild T8 and T9 foreshortening and anterior wedging" and "[m]ild chronic degenerative spurring" in the right elbow.  Mr. Chance was prescribed Norco for pain.[88]

From March 28, 2013 to April 4, 2013, Mr. Chance went to physical therapy for his right knee.  He reported being stiff and sore from the car accident on March 26, 2013, but that his knee was not injured in the accident.[89]

On April 3, 2013, Mr. Chance saw Dr. Parker.  He reported "some pain" in the right elbow "with certain movements" and neck and lower back pain, but also reported that "[a]ll [were] getting better."   On physical examination, Dr. Parker observed tenderness to palpation in the neck, left trapezius, right elbow, and lumbar back, but no tenderness over the vertebrae and no deformity.  Dr. Parker noted "muscle and tendon strains only" and recommended "more extensive [physical therapy] treatment if needed."[90]

On April 8, 2013, Mr. Chance followed up with Dr. Hall.  He reported taking Motrin 800 mg three times daily and that the numbness in his leg had not changed.  Dr. Hall observed "decreased sensation from the jointline distally on the anterolateral aspect of the knee down to about 6 cm above the ankle."[91]

---

[88] A.R. 515–20.

[89] A.R. 579–84.

[90] A.R. 692–93.

[91] A.R. 742.

On April 11 and April 16, 2013, Mr. Chance went to physical therapy for his right knee.[92]

On April 17, 2013, at the recommendation of Dr. Hall, Mr. Chance had a nerve conduction study and EMG by Dr. Gevaert at Alaska Spine Institute. Both were normal; they showed no evidence of any spinal radiculopathy or specific damages to the peroneal or tibial nerve.[93]

From April 18 to May 9, 2013, Mr. Chance continued to attend physical therapy for his right knee at Health Quest Therapy.[94]

On May 10, 2013, Mr. Chance followed up with Dr. Hall. He reported pain after "work hardening" exercises in physical therapy. Mr. Chance also reported that he did not fill his prescription of Medrol Dosepak "as he was worried about some of the side effects of prednisone." Dr. Hall observed no significant effusion and "very minimally tender" to palpation posteriorly along the incision line. X-rays of the right knee taken at the visit showed "no evidence of degenerative change of the tibiofemoral or patellofemoral compartments."[95] Dr. Hall completed a disability work status form and indicated Mr. Chance was "totally disabled" for four weeks.[96]

---

[92] A.R. 585–88.

[93] A.R. 521–24.

[94] Mr. Chance attended physical therapy sessions on April 18, 23, 25, and 30, 2013 and May 2, 6, and 9, 2013. A.R. 589–602.

[95] A.R. 739–41.

[96] A.R. 852.

On May 18, 2013, Mr. Chance saw Dr. Bald for a second independent medical examination of his right knee. Dr. Bald observed a normal gait, no ligamentous instability, negative Lachman and drawer tests with normal strength in both lower extremities, but "some diminished sensation along the medial aspect of the tibia, extending to approximately 6 cm above the ankle." Dr. Bald opined that Mr. Chance had effectively reached medical stability regarding his right knee injury. Dr. Bald also opined that Mr. Chance would "not have the physical capabilities in the future" of returning to his previous job as a mechanical specialist. However, the doctor opined that Mr. Chance was capable of full-time employment at a medium level work with restrictions related to squatting, kneeling, crawling, and ladder climbing.[97] In an addendum to the May 2013 examination, Dr. Bald clarified that "no further medical or hands-on treatment of any kind" was reasonable, necessary, or appropriate for Mr. Chance's right knee as of May 18, 2013.[98]

On May 31, 2013, Mr. Chance followed up by telephone with Dr. Hall. Dr. Hall recommended job retraining or Synvisc injections.[99]

On June 28, 2013, Mr. Chance visited Dr. Parker at Coho Family Medicine. Mr. Chance reported bleeding issues on his neck and a sore elbow. On physical examination, Mr. Chance's lumbar back was tender over the left paraspinal muscles, but with no deformity and no vertebral tenderness. Dr. Parker observed a "nodular lesion with central

---

[97] A.R. 632–41.

[98] In the addendum dated June 17, 2013, Dr. Bald did recommend a visco-supplementation injection. A.R. 651–53.

[99] A.R. 738.

ulceration" on the left side of Mr. Chance's neck. At the visit, Dr. Parker diagnosed Mr. Chance with medial epicondylitis in the right elbow and injected the area to reduce pain.[100]

On August 29, 2013, Mr. Chance followed up with Dr. Parker to excise a spot on his neck.[101]

On November 20, 2013, Mr. Chance visited Dr. Brudenell for a worker's compensation referral. He reported right elbow pain. On physical examination, Dr. Brudenell observed full and normal range of motion in the right elbow with "exquisite tenderness" and decreased wrist and grip power. Dr. Brudenell recommended physical therapy and an MRI of the right elbow.[102]

On November 26, 2013, Mr. Chance had an MRI of the right elbow. The MRI showed "moderately severe tendinopathy of the common extensor tendon," a "partial-thickness tear of the proximal-most fibers," and "subtle high signal in the distal triceps tendon." There was no evidence of fracture or dislocation and the common flexor tendon was normal.[103]

On December 3, 2013, Mr. Chance initiated physical therapy at Wasilla Physical Therapy for right elbow pain.[104]

---

[100] A.R. 694–95.

[101] A.R. 696–97.

[102] A.R. 736–37.

[103] A.R. 710.

[104] A.R. 671–72.

On December 6, 2013, Mr. Chance followed up with Dr. Brudenell. Dr. Brudenell diagnosed Mr. Chance with "[e]ntrenched lateral humeral epicondylar tendonitis of the elbow." He recommended physical therapy and indicated that Mr. Chance was "totally disabled from his work activities" with no projected return to work date specified and "intensive therapy in progress."[105]

From December 10 to December 30, 2013, Mr. Chance had multiple visits with Alice Huttunen, P.T., at Wasilla Physical Therapy for his right elbow.[106]

On January 6, 2014, Mr. Chance saw Alice Huttunen, P.T. at Wasilla Physical Therapy, for his right elbow.[107]

On January 10, 2014, Mr. Chance followed up with Dr. Brudenell. He reported "substantial recovery in terms of his elbow function" and he believed he "may be ready to return to work about January 13, 2014 in his job in a HVAC position." On physical examination, Dr. Brudenell observed some elbow tenderness, but noted it was "a fraction of that which we have observed in late 2013." Mr. Chance was not taking any medications at the time.[108] Dr. Brudenell opined that Mr. Chance was able to return to work "as long as duties are available without lifting more than 5 pounds with [r]ight arm."[109]

---

[105] A.R. 681, 734–35.

[106] Mr. Chance attended physical therapy sessions on December 10, 13, 16, and 30, 2013. A.R. 667–670.

[107] A.R. 666. Although the record is dated January 6, 2013, Mr. Chance's right elbow pain was reported as resulting from a motor vehicle accident on March 26, 2013. A.R. 671.

[108] A.R. 732–33.

[109] A.R. 845.

It appears Mr. Chance returned to work for approximately two weeks on or about January 15, 2014.[110]

The following is a summary of the medical records after January 29, 2014, the amended alleged onset date:

On February 5, 2014, Mr. Chance saw Alice Huttunen, PT, at Wasilla Physical Therapy for "mechanical low back pain" and elbow pain after he returned to work. He reported that his back and elbow "flared" when he returned to work. PT Huttunen opined that Mr. Chance had "signs of mechanical low back pain typical of facet or disc pathology," but "[h]is elbow is slowly resolving."[111]

On February 7, 2014, Mr. Chance visited Dr. Brudenell; his chief complaint was lumbar and left hip pain. Mr. Chance reported "some low-grade knee symptoms," but his "right elbow symptoms have almost completely vanished." On physical examination, Mr. Chance's lumbar spine demonstrated "substantial tenderness in the midline relaxed supine at the lumbosacral junction" and "limited range of motion in lumbar flexion and extension." Dr. Brudenell obtained reviewed x-rays of Mr. Chance's lumbar spine. He noted the films demonstrated "degenerative changes at multiple mid lumbar levels including L2-3, L3-4 and to a lesser extent L1-2," "reasonably good preservation of intervertebral disc spaces at L4-5 and particularly L5-S1," and no "significant foraminal encroachment by any osseous structures." Dr. Brudenell recommended a lumbar MRI

---

[110] *See e.g.,* A.R. 659.

[111] A.R. 659, 665. Some medical records dated early 2013 regarding elbow and lower back pain appear to be misdated. *See* A.R. 664–65, 744.

scan and left L4-5 epidural steroid injection.  He noted that Mr. Chance had returned to work full time on January 15, 2014 and recommended no change in that work status.[112]

On February 11, 2014, Mr. Chance had an MRI of his lumbar spine.  The MRI showed "[s]ignificant left-sided neural foraminal encroachment L3-4, L4-5, and L5-S1," including "moderate to severe left neural foraminal encroachment at L4-5 from disc disease in the foraminal area and the apparent impingement of the nerve in the left foraminal area at L5-S1 due to potential pars defect," and "[l]esser prominent disc bulges central paracentral L2-3, L3-4 without compromise central canal."[113]

On February 18, 2014, Mr. Chance had a L4-L5 transforaminal epidural steroid injection.[114]

On February 28, 2014, Mr. Chance again visited Dr. Brudenell.  He reported that the epidural injection afforded him immediate, dramatic pain relief, but "then over several days the pain in his left hip began to recur and he has begun to have quite a bit of spasm and is losing sleep."  On physical examination of the lumbar spine, Dr. Brudenell observed "significant limitation of motion, particularly in extension and right and left lateral bending."  Dr. Brudenell noted the recent MRI results; he prescribed Flexeril 10 mg and noted that

---

[112] A.R. 730–31.

[113] A.R. 708.

[114] A.R. 707.

Mr. Chance was also taking ibruprofen 200 mg.[115]  On the same date, Dr. Brudenell opined that Mr. Chance was "totally disabled" and "unable to work until further notice."[116]

On March 7, 2014, Mr. Chance was discharged from physical therapy at Wasilla Physical Therapy because he had not requested any further treatments after February 5, 2014.[117]  Also on March 7, 2014, Mr. Chance saw Brandy Atkins, DNP, at OPA, on in-house referral by Dr. Brudenell for "left lower back pain that radiates down the left leg." DNP Atkins noted "[n]o symptoms past the knee," "no weakness in the legs," and "[n]o numbness, tingling, or burning in the legs."  Mr. Chance's motor strength testing was 5/5 and symmetric bilaterally, his straight leg raising was negative, the internal and external rotation of his hips was intact without pain, and he "was able to transition from sit to stand without difficulty."  DNP Atkins noted that the x-rays of the lumbar spine taken that day showed "a little bit of a retrolisthesis at L4/5," "pars defect at L5-S1," and "anterior osteophytes notable at L4, L3," but no evidence of compression fracture and his hip joints "appear[ed] okay."  DNP Atkins prescribed Meloxicam 15 mg and Norco 5-325 and refilled his Cyclobenzaprine10 mg prescription.  Mr. Chance request a work status and DNP Atkins indicated she gave him one "to reflect he is capable of light duty."[118]

On March 18 and April 15, 2014, Mr. Chance visited Wasilla Physical Therapy.  He reported that "[e]ven the lightest exercise would make his back pain worse the next day

---

[115] A.R. 727–29.

[116] A.R. 840.

[117] A.R. 658.

[118] A.R. 723–26.

following treatment." The therapist noted that "no progress is being made" and "therapy is only helping to manage his pain."[119]

On April 17, 2014, Mr. Chance visited DNP Atkins for follow up. He reported that physical therapy was not easing his pain, but he felt "a lot stronger." He also reported that Meloxicam was not helping with pain. He reported he was unable to work because the pain was so severe. Mr. Chance's straight leg raising was negative and gait and station were "functional." DNP Atkins opined that Mr. Chance was "failing more conservative care." She stopped Meloxicam because of elevated blood pressure and prescribed gabapentin 300 mg and increased the Norco to 7.5-325 mg. She recommended following up with a spine surgeon.[120]

On May 6, 2014, Mr. Chance visited Steven Parker, M.D., at Coho Family Medicine. Dr. Parker treated Mr. Chance for actinic keratosis, testicular dysfunction, and elevated blood pressure without diagnosis of hypertension. There is no record of any complaint of back pain.[121]

On May 20, 2014, Mr. Chance had a CT scan of the lumbar spine. The CT scan showed "[b]ilateral pars defects" at L5, "fairly severe neural foraminal stenosis on the left at L5-S1," and degenerative changes throughout the lumbar spine, "most pronounced at L2-L3 and L3-L4."[122] Also on May 20, 2014, Mr. Chance visited James Eule, M.D., at

---

[119] A.R. 654–57.

[120] A.R. 718–21.

[121] A.R. 702–03.

[122] A.R. 706.

OPA.  He reported that a home TENs unit provided mild back pain relief, that extensive physical therapy had not helped, and that one epidural injection provided "100% relief for about a day," but did not offer long-term pain relief.  On physical examination, Dr. Eule observed that Mr. Chance was "visibly uncomfortable on the table, shifting positions constantly," but he was "really nontender to palpation over his lower lumbar spine" and had "good strength throughout bilateral lower extremities" and "good range of motion" in the hips.  Dr. Eule diagnosed Mr. Chance with L5 pars fracture and significant foraminal stenosis on the left at L4-5 and L5-S1, mildly at L3-4.[123]

On May 22, 2014, Mr. Chance followed up with Dr. Eule.  Dr. Eule noted that the CT scan showed "obvious bilateral pars defects" and recommended fusion surgery at the L5-S1 level and likely decompression and maybe foraminotomy of the L4-5 level.  Dr. Eule also noted that due to Mr. Chance's smoking habit, fusion surgery was "4-5 times more likely . . . not to heal smoking as little as 1-2 cigarettes a day, so he definitely needs to quit."[124]

On June 27, 2014, Dr. Eule completed the physician portion of Mr. Chance's application for disabled parking.  He indicated that Mr. Chance was "severely limited in [his] ability to walk due to an arthritic, neurological, or orthopedic condition."  He indicated the disability was temporary, extending from June to October 2014.[125]

---

[123] A.R. 715–17.

[124] A.R. 713–14.

[125] A.R. 806.

On July 1, 2014, Mr. Chance visited Marius Maxwell, M.D., at Arctic Spine. His chief complaint was "severe lower back pain and left leg pain following a motor vehicle accident on March 26, 2013." Dr. Maxwell observed normal motor bulk and tone, decreased range of motion in the lumbar spine with paraspinal muscle spasm, and a normal gait and station with good heel, toe, and tandem walk. Dr. Maxwell opined that if Mr. Chance could "live with the pain with further pain management, he should do so." He also noted that "if he needs surgical relief I have recommended an L5-S1 [posterior lumbar interbody fusion]" with a L4-5 foraminotomy or possibly an additional posterior lumbar interbody fusion ("PLIF").[126]

On July 30, 2014, William Backlund, M.D., the state agency medical reviewer, reviewed the medical records and assessed Mr. Chance's physical RFC. He opined that Mr. Chance could perform light duty work, but he was limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently, and he could sit, stand and/or walk for about six hours in an eight-hour workday. Dr. Backlund also opined that Mr. Chance could climb ramps and stairs frequently, ladders, ropes, and scaffolds occasionally, and could kneel, stoop, crouch, and crawl occasionally. He noted that Mr. Chance should avoid concentrated exposure to hazards. Dr. Backlund opined that a more restrictive standing/walking limitation was not warranted "due to normal gait on several exams" that he listed. He noted that Mr. Chance's right elbow pain resolved within twelve months and

---

[126] A.R. 894–95.

was not considered.  The RFC limitations were based on Mr. Chance's L5 spine condition and degenerative joint disease.[127]

On October 7, 2014, Mr. Chance renewed his application for disabled parking.  Dr. Eule completed the physician portion of the application for a temporary period from November 2014 to May 2015 due to being severely limited in his ability to walk.[128]

On October 23, 2014, Mr. Chance visited DNP Atkins.  He reported "increasing pain about his left lower back and left leg."  He also reported that his left leg was "getting weak and the knee [was] buckling on him at times."  Mr. Chance also noted that "he knows he needs surgery, but cannot consider it until next year because he is working on getting his finances squared away to cover it."  On physical examination, DNP Atkins observed very mild weakness with left knee extension and flexion, a positive straight leg raising on the left, lumbar range of motion was not tolerated well in any direction, and gait and station were functional.  She prescribed gabapentin and Percocet.[129]

On October 28, 2014, Mr. Chance saw Dr. Parker.  He reported his chief complaint as "back surgery."  Dr. Parker noted normal deep tendon reflexes in upper and lower extremities, no edema, 5/5 motor "proximally and distally of bilateral lower extremities on [the right,]" but 4/5 left plantar dorsiflexion strength.  His gait was within normal limits.[130] Also on October 28, 2014, Dr. Parker completed a medical statement regarding physical

---

[127] A.R. 95–99.

[128] A.R. 807.

[129] A.R. 819–21.

[130] A.R. 941–42.

abilities and limitations. He identified several diagnoses of Mr. Chance's back made by other health care providers. He then opined that Mr. Chance was limited to standing or sitting for 15 minutes at a time and 60 minutes total in a work day. Dr. Parker also opined that Mr. Chance could lift up to 10 pounds frequently, that he could never bend, stoop, operate a motor vehicle, or work around dangerous equipment. He indicated that Mr. Chance could occasionally balance and raise his left arm over shoulder level; had occasional fine and gross manipulation with the right hand; frequent fine and gross manipulation with the left hand; and could frequently raise his right arm over shoulder level. Dr. Parker opined that Mr. Chance could frequently tolerate heat and cold, dust, smoke, or fumes, and noise exposure. He also noted that Mr. Chance would need to elevate his legs occasionally during an eight-hour work day and that Mr. Chance's pain was severe.[131]

On October 30, 2014, Dr. Eule completed a medical statement regarding physical abilities and limitations. He opined that Mr. Chance could work up to one hour per day; stand or sit up to 15 minutes at a time for a total of 60 minutes in a work day; could lift 10 pounds occasionally and five pounds frequently; could never bend, stoop, or work around dangerous equipment; and occasionally balance. Dr. Eule indicated that Mr. Chance had occasional fine and frequent gross manipulation of the right hand; frequent fine and gross manipulation of the left hand; could occasionally raise his left arm over shoulder level; frequently raise his right arm over shoulder level; occasionally operate a motor vehicle; and frequently tolerate heat and cold, dust, smoke, or fumes, and noise exposure. Dr.

---

[131] A.R. 808–09.

Eule opined that Mr. Chance would need to frequently elevate his legs during an eight-hour work day and had limited distance vision. He assessed the severity of Mr. Chance's pain as moderate.[132]

On January 19, 2015, Mr. Chance visited Dr. Parker. He reported no new swelling or pain and that he continued smoking. On physical examination, Dr. Parker observed normal deep tendon reflexes in upper and lower extremities and no edema. He diagnosed Mr. Chance with spinal stenosis of the lumbar region with neurogenic claudication and high blood pressure.[133] Also on January 19, 2015, Dr. Parker completed a disability impairment questionnaire on a form provided by Mr. Chance's attorney. He opined that Mr. Chance was limited to sitting up to one hour in an eight-hour workday, needed to move around every 15 minutes, and needed to elevate both legs while sitting. He also indicated that Mr. Chance was limited to standing or walking less than one hour each in an eight-hour workday and needed to return to a seated position every 15 minutes. Dr. Parker opined that Mr. Chance could occasionally lift and carry up to five pounds; occasionally grasp, turn, and twist objects bilaterally; occasionally use his hands/fingers for fine manipulations; and never/rarely use his arms for reaching. He noted that Mr. Chance would need to take unscheduled breaks every 15 minutes and would likely be absent from work more than three times a month due to his impairments or treatment.[134]

---

[132] A.R. 810–11.

[133] A.R. 943–44.

[134] A.R. 936–40.

On February 26, 2015, Mr. Chance saw Susan Klimow, M.D., for a consultative examination. He reported "constant discomfort in the low back radiating to the left leg" and right elbow pain. He also reported that he required assistance with activities of daily living, including getting his socks on. On physical examination, Dr. Klimow observed no edema or cyanosis, limited left upper extremity range of motion "for abduction of the left shoulder when compared to the right with no evidence of impingement." She also observed lumbosacral spine decreased range of motion in all planes and positive left straight leg raising. Dr. Klimow observed bilateral upper extremities intact to light touch and right lower extremity intact to light touch; right and left upper extremity grip 5/5; bilateral wrist flexion 5/5; right wrist extension 4/5; left wrist extension 5/5; bilateral elbow extension and flexion 5/5; and 5/5 lower extremities motor strength throughout. Dr. Klimow opined that Mr. Chance's "chronic low back pain with radiculopathy to the left lower extremity" limited his ability to "do prolonged sitting, standing, moving about, or traveling." She opined that his "low back issue with decreased low back range of motion" limited his ability to lift and carry. She also indicated that due to Mr. Chance's left shoulder discomfort, "he should limit repetitive work above shoulder level."[135]

On March 2, 2015, Mr. Chance visited Andrew Jaconette, M.D., at Comprehensive Pain Management. On physical examination, Dr. Jaconette observed a mildly antalgic gait favoring the left lower extremity; Mr. Chance appeared stable and ambulated without an assistive device. The doctor observed mildly painful range of motion with left shoulder abduction; deep tendon reflexes 1/2 on the right shoulder and 2/2 on the left shoulder;

---

[135] A.R. 175–79.

deep tendon reflexes 1/2 bilaterally on the knees, otherwise absent; a positive single leg raising test on the left; positive facet loading, left more than right; motor 4/5 left extensor hallucis longus; and diffuse paraspinal tenderness bilaterally, but no swelling or effusion. Dr. Jaconette diagnosed Mr. Chance with "left lower extremity radicular complaints secondary to L5 pars fractures with anterior listhesis resulting in moderate-severe neural foraminal stenosis at L5-S1 and mild to moderate stenosis at L4-5"; multilevel degenerative disc disease with probable discogenic pain; probable facetogenic pain; recurrent lumbar spasms; and sleep disorder, not otherwise specified. He noted that Mr. Chance's "functional abilities continue to decline despite conservative care." Dr. Jaconette refilled Mr. Chance's Percocet prescription and prescribed Lyrica and Zanaflex.[136]

On March 30, 2015, Mr. Chance visited Dr. Jaconette for follow up and medication refills. He reported improvement with Lyrica and Zanaflex and better sleep. Dr. Jaconette observed a mildly antalgic gait favoring the left, mildly painful range of motion with left shoulder abduction, and left shoulder impingement signs. He observed increased lordosis, no step-off deformity, limited and painful range of motion in the back in all planes, bilateral facet loading, and diffuse paraspinal tenderness bilaterally. Dr. Jaconette noted 4/5 motor strength in Mr. Chance's left leg; decreased sensation to the left L5 dermatomal distribution involving the foot; deep tendon reflexes 1/2 bilaterally at the knee, otherwise

---

[136] A.R. 977–78.

absent; and an equivocal straight leg raising test. Dr. Jaconette refilled Mr. Chance's prescriptions.[137]

On April 2 and 3, 2015, Mr. Chance saw occupational therapist Liz Dowler, Ph.D., for a physical capacities evaluation. OT Dowler summarized many of Mr. Chance's medical records. On physical assessment, Mr. Chance showed "limited motion in his lumbar spine most significantly in flexion, lateral bending and rotation to the left" with 5/5 motor strength in the lower extremities and poor grip and pinch strength in the right arm due to tendinopathy. OT Dowler limited Mr. Chance to sedentary work, but she found his pace to be "not within functional productivity standards." Thus, she concluded, "[e]ssentially he is unable to work." OT Dowler opined that Mr. Chance was unable to crouch or bend, crawl, twist, reach overhead or to the floor, and could only kneel on one knee. She opined that his medications prevented him from driving safely.[138]

On April 20, 2015, Raymond North answered vocational interrogatories as a vocational expert. He indicated that "the physical demands of [Mr. Chance's past] work exceed[ed] the light RFC" in the interrogatory's hypothetical. But he opined Mr. Chance could perform certain light duty unskilled jobs that exist in the national economy, such as cashier II, storage rental clerk, and order caller.[139]

On May 26, 2015, Mr. Chance followed up with Dr. Jaconette. He reported "doing poorly" and that he had not been taking Lyrica due to "insurance issues and he could not

---

[137] A.R. 985.

[138] A.R. 961–74.

[139] A.R. 183–89.

afford the medication on his own." On physical examination, Dr. Jaconette's observations were essentially the same as at previous visits. Dr. Jaconette noted Mr. Chance was "mildly antalgic" and used a cane. He refilled Mr. Chance's Percocet prescription, increased the gabapentin dosage, and refilled the Zanaflex prescription. Dr. Jaconette noted that his office had not received any paperwork from Mr. Chance's insurer regarding the denial of Lyrica.[140]

On July 21, 2015, Mr. Chance saw Dr. Jaconette for medication refills. He reported "no real change"; his low back pain continued "to be under reasonable control," but he still had to limit his activities. He also reported that his left shoulder pain had improved. Dr. Jaconette again observed a mildly antalgic gait favoring the left and Mr. Chance's use of a cane. He observed a painful grip on the right, but Mr. Chance's range of motion in both arms was "grossly intact" with normal sensation. Dr. Jaconette noted a limited extension/rotation range of motion in the back, facet loading on the left, and diffuse paraspinal tenderness on the left. He also noted 4/5 motor strength in Mr. Chance's left leg and decreased sensation to the left L5 dermatomal distribution involving the foot. Dr. Jaconette refilled Mr. Chance's Percocet, gabapentin, and Zanaflex prescriptions. He recommended physical therapy and pool therapy to improve activity tolerance and aid in weight loss.[141]

On September 15, 2015, Mr. Chance followed up with Dr. Jaconette. He reported "everything is about the same." He also reported that his medications provided him with

---

[140] A.R. 983–84.

[141] A.R. 981–82.

"moderate relief."  Dr. Jaconette again noted a mildly antalgic gait favoring the left and that Mr. Chance used a cane.  The results of a physical examination were substantially the same as prior visits.  Dr. Jaconette refilled Mr. Chance's prescriptions.  He again recommended physical therapy and pool therapy to improve activity tolerance and aid in weight loss.  He also recommended that Mr. Chance consult with his primary care physician regarding hypertension.[142]

On November 3, 2015, Mr. Chance visited Dr. Jaconette.  He reported that his low back pain had worsened in the past month, possibly due to increased driving to Anchorage.  On physical examination, Dr. Jaconette's observations were essentially the same as previous visits.  Dr. Jaconette recommended L5-S1 facet and pars defect injections, in addition to renewing his physical therapy and pool therapy recommendations.[143]

On November 17, 2015, Mr. Chance received bilateral lumbar facet injections at L5-S1 from Dr. Jaconette.[144]

On November 24, 2015, Mr. Chance visited Dr. Jaconette.  He reported that his low back and left-sided upper buttock pain "was reduced by 50%" for the first 24-48 hours after the facet injections.  He reported that his pain increased on days three and four after the injections, but resolved after five days and he experienced a 20% improvement.  Dr. Jaconette again noted a mildly antalgic gait favoring the left with use of a cane.  The

---

[142] A.R. 979–80.

[143] A.R. 989–90.

[144] A.R. 991.

doctor's objective observations were similar to prior visits; prescriptions were refilled.  Dr. Jaconette again recommended pool therapy as well as lumbar medial branch blocks.[145]

In a letter dated May 15, 2016, Dr. Eule wrote to Mr. Chance's attorney that "Mr. Chance has a treatable problem in his back that [  ] with surgery, most people would recover and be able to return to gainful employment.  It would not be incapacitating and needing disability.  Therefore, I do not support his pursu[it] of disability."[146]

*Hearing Testimony*

On January 23, 2015, Mr. Chance testified before ALJ Hebda, with attorney representation.  He testified that the lower left side of his back was in constant pain and the pain radiated into his left leg and foot.  He indicated that his left toes were numb and that his right toes were "starting to numb a little bit."  He testified that his right knee was "beginning to get irritated" because he constantly had to shift his weight to the right and his right elbow was irritated because he had to "use the cane to take the weight off."  He indicated that the cane was prescribed originally by Dr. Hall after his second right knee surgery.  Mr. Chance testified that he briefly returned to work in January 2014 as a HVAC coordinator, but stopped because he had "severe pain" in his lower left back caused by "walking and being on my feet" and his "elbow was getting more irritated."  He indicated that walking and "just being on my feet" exacerbated his back injury.  He testified that two physicians, Drs. Eule and Maxwell, indicated that he needed back surgery.  Mr. Chance testified that before he could schedule the surgery, he needed to "completely be nicotine

---

[145] A.R. 992–93.

[146] A.R. 994.

free for 20 days." He also indicated that he needed to come up with a $10,000 copayment for his insurance company. He reported that he smoked four to five cigarettes a day at the time of the hearing. His attorney indicated that Mr. Chance's knee was "not really the issue any more." Mr. Chance testified that he would shower and dress, sit with a heating pad on a recliner chair, and alternate sitting, standing, and stretching most of the day inside the house. He testified that he watched some TV and did research on his iPad. He also testified that he visited with his daughter and grandchildren, but he could not pick the children up. Mr. Chance indicated that his wife usually drove because he couldn't drive "in one stationary position" and his medication made him "very dizzy [and] confused." Mr. Chance testified that his spouse also made dinner, but he could make sandwiches. He indicated that he could stand about ten minutes before changing positions. ALJ Hebda stopped the hearing to inform Mr. Chance's attorney that he had "serious problems" with the disability reports prepared by Dr. Eule and Dr. Parker, because they were inconsistent with Mr. Chance's testimony and the medical evidence.[147] He also expressed concern that Mr. Chance was still smoking. The ALJ determined that he would order a consultative examination by a "physologist." ALJ Hebda also allowed Mr. Chance the option to request a supplemental hearing.[148]

On December 22, 2015, Mr. Chance appeared with counsel at a supplemental hearing at which the vocational expert, Raymond North, testified. The ALJ noted that the

---

[147] Dr. Eule completed a disability report on October 30, 2014. A.R. 810–11. Dr. Parker completed a medical statement on October 28, 2014 and a disability impairment questionnaire on January 19, 2015. A.R. 936–40, 808–09.

[148] A.R. 49–81.

supplemental hearing was "at the request of [Mr. Chance]'s representative to review and question the responses to vocational interrogatories." Mr. Chance's attorney asked VE North if Mr. Chance had "any transferrable skills from [his] work history to a sedentary job?" VE North replied, "No." VE North also testified that Mr. Chance's past work required occasional reaching; it also required climbing ladders, crawling, and kneeling "more than never." ALJ Hebda did not pose any additional hypotheticals and did not question VE North at the hearing.[149]

*Function Report*

Mr. Chance completed a function report on June 17, 2014. He indicated that due to his "permanent physical impairments" of his "knee, back and elbow," he was unable to bend, lift, walk any distance, or "climb, stoop, kneel, crouch, crawl, or grasp large objects which is required for my job." He added that he was unable to sit or stand without severe pain "due to the severe neural foraminal stenosis." He reported that the medications he took for pain caused dizziness and loss of concentration. He indicated that his wife did all the housework, yardwork, shopping, bill paying, and "animal feeding." He reported that he could prepare sandwiches and microwave food and do ironing. He reported needing assistance sometimes in putting on his pants and socks. He reported he could walk 40 feet before needing to rest.[150]

---

[149] A.R. 84–87.

[150] A.R. 263–71.

# IV. DISCUSSION

Mr. Chance is represented by counsel.  In his opening brief, he asserts that the ALJ: (1) "failed to assess medical evidence—including medical opinion evidence—as required by 20 C.F.R. § 1527"; (2) "failed to understand the regulation relating to 'objective medical evidence,' and failed to apply correctly the regulatory provisions relating to acceptable evidence"; and (3) "committed reversible error by assigning 'little weight' to occupational therapist Dr. Liz Dowler, Ph.D., by discounting her evaluation and her opinion on the basis that she is not an acceptable medical source."[151]  The Commissioner contests each of the above assertions.[152]  The Court addresses Mr. Chance's arguments in turn:

A.    Medical Opinions

Mr. Chance alleges that ALJ Hebda failed to comply with the applicable regulations in assessing the medical evidence.  Specifically, he alleges the ALJ erred: (1) by assigning "little weight" to the medical source opinions of treating physicians Drs. Parker and Eule and "no weight" to treating physician Dr. Brudenell; (2) by assigning "little weight" to occupational therapist Liz Dowler, Ph.D.; and (3) by assigning "great weight" to the state agency physician Dr. Backlund.[153]  The Commissioner asserts that the ALJ "appropriately

---

[151] Docket 13 at 5–25.

[152] Docket 14 at 7–22.

[153] Docket 13 at 7–8.

resolved conflicts in the medical opinions" to determine that Mr. Chance had the RFC to perform a range of light work.[154]

    1. *Legal Standard*

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[155]  Medical opinions come from three types of sources: those who treat the claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant.  "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[156]  The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."[157]

In the Ninth Circuit, "[t]o reject the uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."[158]  Even "if a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons

---

[154] Docket 14 at 12.

[155] 20 C.F.R. § 404.1527(c).  This section applies to claims filed before March 27, 2017.

[156] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[157] 20 C.F.R. § 404.1527(c)(2).

[158] *Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017) (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)).

supported by substantial evidence."[159]  This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."[160]

Factors relevant to evaluating any medical opinion include: (1) the examining or treatment relationship; (2) the consistency of the medical opinion with the record as a whole; (3) the physician's area of specialization; (4) the supportability of the physician's opinion through relevant evidence; and (5) other relevant factors, such as the physician's degree of familiarity with the SSA's disability process and with other information in the record.[161]

---

[159] *Revels v. Berryhill,* 874 F.3d 648, 654 (9th Cir. 2017).

[160] *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)).

[161] 20 C.F.R. §§ 404.1513a(b), 404.1527(c)(2).  These sections apply to claims filed before March 27, 2017.  *See* 20 C.F.R. § 404.614.  Additionally, the regulations in effect in 2014, when Mr. Chance filed his initial application, read as follows:

(ii) When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, the administrative law judge will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions. Unless a treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.

(iii) Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart. When administrative law judges consider these opinions, they

The SSA also permits a claimant to provide evidence from non-physician sources as to the severity of an impairment and how it affects a claimant's ability to work, including evidence from a nurse practitioner, physician assistant (PA), chiropractor, or therapist, including a physical therapist.[162]    The ALJ may discount opinions from these "other sources" if the ALJ "gives reasons germane to each witness for doing so."[163]

### 2. *Dr. Parker*

Dr. Parker was Mr. Chance's primary care physician and treated Mr. Chance before and after the amended onset date of January 29, 2014.[164]   He opined on January 19, 2015, that Mr. Chance's limitations were so severe that he was unable to work full-time. Dr. Parker's work opinion was contradicted by Dr. Backlund.[165]   Therefore, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence for discounting Dr. Parker's opinion.[166]

The ALJ did not accept Dr. Parker's opinion that Mr. Chance was limited to standing

---

will evaluate them using the rules in paragraphs (a) through (d) of this section. § 404.1527(e)(2)(ii), (iii).

[162] 20 C.F.R. §§ 404.1513(d).  This section applies to claims filed before March 27, 2017.

[163] *Turner v. Comm'r of Soc. Sec.,* 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001)).

[164] *See* A.R. 683–703, 941–48.

[165] Dr. Backlund opined that Mr. Chance could perform a range of light work limited to occasionally lifting and carrying twenty pounds and ten pounds frequently; standing, walking, or sitting about six hours in an eight-hour workday; frequently climbing ramps and stairs; occasionally climbing ladders, ropes, scaffolds; and occasionally stooping, kneeling, crouching, and crawling.  A.R. 94–96.

[166] *Revels,* 874 F.3d at 654.

or sitting for 15 minutes at a time for one hour total in an eight-hour work day; was limited to lifting up to 10 pounds frequently; could never bend, stoop; occasionally balance or raise his left arm over shoulder level; could frequently tolerate heat and cold, dust, smoke, or fumes, and noise exposure; and would need to occasionally elevate his legs during an eight-hour work day.[167] ALJ Hebda described Dr. Parker's "opinion regarding [Mr. Chance]'s limitations [as] extreme and unsupported."[168]

The ALJ provided the following specific reasons for assigning little weight to Dr. Parker's opinion: (1) he "did not provide an explanation of what objective evidence he based his opinion upon"; (2) his treatment notes "reveal[ ] no significant examination findings during the period beginning January 29, 2014 that would explain limitations as extreme as those provided by Dr. Parker"; (3) the "medical evidence of record does not include evidence of a respiratory or other impairment that would reasonably require limitations on [Mr. Chance]'s exposure to heat, dust, smoke, or fumes" or impaired vision or hearing; and (4) "neither Dr. Parker's treatment notes nor [Mr. Chance]'s treatment records in general reveal persistent lower extremity swelling or other condition that would require elevation of the legs."[169]

An ALJ "may discredit treating physicians' opinions that are conclusory, brief an unsupported by the record as a whole or by objective medical findings."[170] But rejecting

---

[167] A.R. 808–09.

[168] A.R. 31.

[169] *Id.*

[170] *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1195 (9th Cir. 2004) (citation omitted).

an opinion by a treating physician on a check-box form simply because it contains almost no details or explanation is not a specific and legitimate reason to reject that opinion if there are extensive treatment notes by that treating physician which support the opinion.[171] Here, the ALJ specifically addressed Dr. Parker's treatment notes in rejecting that doctor's opinions.  Further, not only did the forms filled out by Dr Parker fail to list objective medical findings or provide explanations, the limitations in Dr. Parker's work opinion were also inconsistent with his treatment notes and Mr. Chance's treatment history.  For example, treatment records from visits with Dr. Parker in April and June 2013, shortly after Mr. Chance's motor vehicle accident in March 2013, showed that Mr. Chance reported "some pain" in the right elbow "with certain movements" and neck and lower back pain, but also reported that "[a]ll [were] getting better."  At the April 2013 visit, Dr. Parker noted "muscle and tendon strains only" and recommended "more extensive [physical therapy] treatment if needed." Dr. Parker observed tenderness to palpation in the neck, left trapezius, right elbow, and lumbar back, but no tenderness over the vertebrae and no deformity.[172]  At a visit on May 6, 2014, there was no record of any complaint of back pain.[173]  However, in October 2014 and again in January 2015, Dr. Parker opined that Mr. Chance was limited to sitting, standing, or walking up to one hour

---

[171] *See Burrell v. Colvin*, 775 F.3d 1133, 1140 (9th Cir. 2014).

[172] A.R. 692–95.

[173] A.R. 702–03.

per eight-hour work day; had some limitation to exposure to heat and cold, dust, smoke, and noise; and needed to elevate his legs during the work day.[174]

Additionally, Mr. Chance's daily activities did not support Dr. Parker's work limitations. An ALJ may discount a physician's opinion when the treatment records and evidence of daily living activities contradict the opinion.[175] Although Mr. Chance reported that he was unable to sit or stand without severe pain and testified that walking and "just being on my feet" exacerbated his back injury, he also testified that he showered and dressed on his own; spent most of the day seated with a heating pad on a recliner chair alternating sitting, standing, and stretching; made simple meals; ironed; and visited with his grandchildren, although he did not lift them up.[176] He did not report hearing or vision impairments or other impairments to a degree that limitations to heat, cold, smoke, or noise exposure were medically necessary. And, although he testified that he sat in a recliner chair, he did not report edema or excessive swelling.[177]

Dr. Backlund's contradicting opinion further supports ALJ Hebda's rejection of Dr. Parker's opinions.[178] Dr. Backlund opined that Mr. Chance could lift and carry up to 20

---

[174] A.R. 808–09, 936–40.

[175] *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 600–02 (9th Cir. 1999).

[176] A.R. 49–81, 263–71.

[177] A.R. 63. Mr. Chance reported that he wore glasses/contacts. A.R. 269.

[178] A.R. 95–96. Dr. Backlund's opinion alone is not substantial evidence justifying the rejection of Dr. Parker's work limitations. *See Lester v. Chater,* 81 F.3d 821, 831 (9th Cir. 1995) (The "opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician."); *see also Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002) (the "opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other

pounds occasionally and 10 pounds frequently; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; and avoid concentrated exposure to hazards.[179]  The ALJ also accounted for "recent findings associated with [Mr. Chance]'s left shoulder" and "left lower extremity radicular symptoms" by finding Mr. Chance "somewhat more limited in terms of his ability to use his left upper and left lower extremities."[180]

For the foregoing reasons, the Court finds that the ALJ provided specific and legitimate reasons supported by substantial evidence for rejecting Dr. Parker's opinion regarding Mr. Chance's work limitations.

### 3.  *Dr. Eule*

Dr. Eule was Mr. Chance's treating physician from approximately May 20, 2014 through October 2014.[181]  His opinions regarding Mr. Chance's work limitations and his ability to walk were contradicted by Dr. Backlund.[182]  Therefore, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Eule's opinions, based on substantial evidence in the record.[183]

In October 2014, Dr. Eule opined that Mr. Chance could work up to one hour per day; stand or sit up to 15 minutes at a time for a total of 60 minutes in a work day; could

---

evidence in the record.").

[179] A.R. 95–96.

[180] A.R. 31.

[181] A.R. 713–17, 976, 994.

[182] A.R. 95–96.

[183] *Revels,* 874 F.3d at 654.

lift 10 pounds occasionally; five pounds frequently; never bend, stoop, or work around dangerous equipment; and occasionally balance. Dr. Eule indicated that Mr. Chance had occasional fine and frequent gross manipulation of the right hand; frequent fine and gross manipulation of the left hand; could occasionally raise his left arm over shoulder level; frequently raise his right arm over shoulder level; occasionally operate a motor vehicle; and frequently tolerate heat and cold, dust, smoke, or fumes, and noise exposure. Dr. Eule opined that Mr. Chance would need to frequently elevate his legs during an eight-hour work day and had limited distance vision.[184]

ALJ Hebda found Dr. Eule's "opinion regarding [Mr. Chance]'s limitations to be extreme and unsupported" and gave the opinion "little weight." The ALJ specifically noted that Dr. Eule's treatment notes "do not include findings associated with the upper extremities, [Mr. Chance]'s vision or hearing, or [Mr. Chance]'s respiratory functioning" and neither Dr. Eule's treatment notes nor the treatment records in general "reveal persistent lower extremity swelling or another condition that would require elevation of the legs."[185]

The ALJ's specific reasons for rejecting Dr. Eule's opinions regarding Mr. Chance's work restrictions are supported by substantial evidence in the record. For example, Dr. Eule's treatment notes on May 2014 showed that Mr. Chance was "visibly uncomfortable on the table, shifting positions constantly" and could not "bend forward more than 10

---

[184] A.R. 810–11. In a letter dated May 15, 2016, Dr. Eule wrote to Mr. Chance's attorney that Mr. Chance's back problem was treatable with surgery and he "[did] not support [Mr. Chance's] pursu[it] of disability." A.R. 994.

[185] A.R. 32.

degrees," but "really nontender to palpation over his lower spine" and had "good strength throughout the bilateral lower extremities" and "good range of motion of his hips." Dr. Eule observed "no leg swelling, edema, or ulcerations" and that Mr. Chance was "able to get up and ambulate around and rock up on his toes and back on his heels." After a CT scan showed bilateral pars defects, Dr. Eule recommended fusion surgery, but noted that Mr. Chance had to quit smoking first. Dr. Eule's treatment notes do not address Mr. Chance's upper extremities, vision, hearing, or respiratory function.[186]

The ALJ also gave little weight to Dr. Eule's opinions in June and October 2014 that Mr. Chance was severely limited in his ability walk because the opinions did not have "an explanation of supporting evidence" or a "description of the degree of this limitation."[187] As stated above, the ALJ "may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings."[188] Here, Dr. Eule completed two temporary disabled parking applications with no explanation for the walking limitation.[189] At the same time, his treatment notes indicated that Mr. Chance had good motor strength in his legs, good range of motion in his hips, and that he could "get up and ambulate around."[190]

---

[186] A.R. 713–17.

[187] A.R. 32.

[188] *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d at 1195.

[189] A.R. 806–07.

[190] A.R. 713–17.

Based on the foregoing, the Court finds that the ALJ provided specific and legitimate reasons, supported by substantial evidence, for rejecting Dr. Eule's opinion regarding Mr. Chance's work restrictions and walking limitation.

### 4. *Dr. Brudenell*

Dr. Brudenell was Mr. Chance's treating physician from approximately November 2013 through February 2014. In January 2014, he opined that Mr. Chance could return to work "as long as duties are available without lifting more than 5 pounds with [the] [r]ight arm."[191] But in February 2014, Dr. Brudenell opined that Mr. Chance was "totally disabled."[192] His work opinions were contradicted by Dr. Backlund. Therefore, the ALJ was required to provide specific and legitimate reasons for rejecting Dr. Brudenell's work opinions, based on substantial evidence in the record.[193]

The ALJ found Dr. Brudenell's statements "unsupported" and gave them no weight. He provided the following reasons: (1) Dr. Brudenell "did not include a description of what evidence he relied upon in rendering his opinions"; (2) while Dr. Brudenell's "treatment notes reveal examination findings associated with [Mr. Chance]'s lumbar spine and right elbow condition, these findings do not suggest disabling limitations"; and (3) Mr. Chance's "treatment records do not include persistent right elbow pain or related symptoms during the period beginning January 29, 2014."[194]

---

[191] A.R. 845.

[192] A.R. 840.

[193] *Revels,* 874 F.3d at 654.

[194] A.R. 32.

Incongruity between a medical source's opinion and that source's treatment records is a specific and legitimate reason for rejecting that opinion.[195]  Here, Dr. Brudenell's treatment records do not support the limitations endorsed by Dr. Brudenell in Mr. Chance's January and February 2014 disability work forms.  For example, at the January 10, 2014 visit, Dr. Brudenell observed full and normal range of motion in Mr. Chance's elbow with "some tenderness in the region of the extensor communis origin at the lateral humeral epicondyle, but certainly the degree of tenderness is a fraction of that which we observed in late 2013."  Dr. Brudenell also noted that at that visit Mr. Chance was ready for full duty, "with specific limitations, namely avoiding gripping tools as much as he can."[196]  However, that same day, Dr. Brudenell indicated that Mr. Chance could not lift more than five pounds with his right arm.[197]  Further, on February 5, 2014, PT Huttunen at Wasilla Physical Therapy noted that Mr. Chance's grip strength was improving and that he had full range of motion in his elbow.[198]  And, on February 7, 2014, Dr. Brudenell noted that Mr. Chance's "elbow symptoms have almost completely vanished" and "[h]e does not notice any significant elbow pain working full time currently."[199]

---

[195] *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008); *see also Ghanim v. Colvin,* 763 F.3d 1154, 1161 (9th Cir. 2014)("[a] conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider.") (citations omitted).

[196] A.R. 732.

[197] A.R. 845.

[198] A.R. 659.

[199] A.R. 730–31.

In his February 28, 2014 opinion, Dr. Brudenell noted that Mr. Chance's MRI of the lumbar spine revealed "three-level lumbar disc disease" and "significant left foraminal encroachment at the L3-4 level." He prescribed Flexeril 10 mg and noted that Mr. Chance was taking ibuprofen 200 mg. He referred Mr. Chance to the in-house spine doctors for further care and noted that Mr. Chance reported that he had "not been able to work for at least the last three weeks secondary to his lumbar left hip pain." Dr. Brudenell noted no knee or elbow symptoms.[200] But on that same day, Dr. Brudenell then opined that Mr. Chance was "totally disabled" and "unable to work until further notice."[201]

Mr. Chance argues that at the time of Dr. Brudenell's January 2014 and February 2014 opinions he had not yet made a disability claim "so there is no reason to believe that Dr. Brudenell was opining in derogation of any authority of the agency to adjudicate disability."[202] However, these opinions were made only a few weeks prior to Mr. Chance's disability benefits application on or about March 27, 2014 and were reasonably related to Mr. Chance's disability claim.[203]

Incongruities between Dr. Brudenell's disability work form responses and his contemporaneous treatment records as noted by the ALJ are specific and legitimate reasons for rejecting Dr. Brudenell's opinion of Mr. Chance's work limitations.

---

[200] A.R. 727–28.

[201] A.R. 840.

[202] Docket 13 at 12.

[203] A.R. 22, 100, 220.

5.  *OT Liz Dowler*

OT Liz Dowler examined Mr. Chance on April 2–3, 2015.  Her physical assessment of Mr. Chance showed "limited motion in his lumbar spine most significantly in flexion, lateral bending and rotation to the left" with 5/5 motor strength in the lower extremities and poor grip and pinch strength in the right arm due to tendimopathy.  She limited Mr. Chance to sedentary work and stated that "[e]ssentially he is unable to work."  OT Dowler opined that Mr. Chance was unable to crouch or bend, crawl, twist, reach overhead or to the floor, and could only kneel on one knee.  She opined that his medications prevented him from driving safely.[204]  Because OT Dowler was a non-physician source, the ALJ was required to provide germane reasons for discounting her opinions.[205]

An ALJ may discount lay testimony that conflicts with medical evidence.[206]  Here, the ALJ gave OT Dowler's opinion "little weight" because he noted that the examination was not consistent with Mr. Chance's treatment records or "within Dr. Klimow's report less than two months prior to this examination."  The ALJ specifically noted that the treatment records did not "reveal complaints of symptoms associated with [Mr. Chance]'s right elbow during the period beginning January 29, 2014," nor did the records "include evidence of significant and persistent upper extremity weakness" or "limitations on [Mr. Chance]'s ability to concentrate."[207]  Substantial evidence in the record supports these

---

[204] A.R. 961–74.

[205] *Turner v. Comm'r of Soc. Sec.,* 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001)).

[206] *Lewis,* 236 F.3d at 511.

[207] A.R. 32–33.

determinations. Moreover, the ALJ accounted for Mr. Chance's upper left extremities limitations in the RFC.[208]

For the foregoing reasons, the ALJ provided germane reasons for discounting OT Dowler's opinions.

B.  Knee and Shoulder Limitations in the RFC

Mr. Chance asserts that the ALJ erred because Mr. Chance's "right knee impairment and left shoulder impairment can be critical in the context of judicial appellate review of a residual functional capacity of Light exertional capacity."[209]  Specifically, Mr. Chance asserts that the ALJ erred by finding that "up to one-third of the workday [Mr. Chance] can purportedly engage in four postural activities that engage the knee and place stress directly upon it, which means he could spend more than an entire workday on his knees."[210]  He also argues that if "stooping cannot be done at least on an 'occasional' basis, then the RFC of Light exertional is not supported by substantial evidence."[211]  The Commissioner asserts that the ALJ "considered [Mr. Chance's] allegations of knee pain and functional limitations, but appropriately found them unreliable by providing several clear and convincing reasons supported by substantial evidence."[212]

---

[208] The ALJ limited Mr. Chance to "only occasional repetitive overhead work with the left upper extremity (non-dominant)."  A.R. 26.

[209] Docket 13 at 19.

[210] Docket 13 at 22.

[211] Docket 13 at 21.

[212] Docket 14 at 9.

The ALJ found that Mr. Chance had the "residual functional capacity to perform light work as defined in 20 CFR 404.1567(b)." In addition, the ALJ limited Mr. Chance to "frequent pushing/pulling with left lower extremity; only frequent climbing of ramps or stairs; only occasional climbing of ladders, ropes, or scaffolds; only occasional stooping, kneeling, crouching, and crawling; only occasional repetitive overhead work with the left upper extremity (non-dominant); the avoidance of concentrated exposure to excessive vibration and unprotected heights; and a sit/stand option allowing individual to alternate sitting or standing positions throughout the day."[213]

A court should affirm an ALJ's determination of a claimant's RFC "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence."[214] It is "proper for an ALJ to limit a hypothetical to those impairments that are supported by substantial evidence in the record."[215] In determining an RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"[216] In the Ninth Circuit, courts have found that "[c]onsideration of 'the limiting effects of all impairments' does not necessarily require the inclusion of every

---

[213] A.R. 26.

[214] *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005) (citing *Morgan v. Comm'r of Soc. Sec. Admin.,* 169 F.3d 595, 599 (9th Cir. 1999)).

[215] *Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir. 2001) (citing *Magallanes v. Bowen,* 881 F.2d 747, 756-57 (9th Cir. 1989) ("the ALJ was free to accept . . . that the claimant's depression was mild and would not significantly interfere with the performance of work related activities.")).

[216] *See* SSR 96-08p, *available at* 1996 WL 374184 at *5; 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'").

impairment into the final RFC if the record indicates the non-severe impairment does not cause a significant limitation in the plaintiff's ability to work."[217]

Here, the ALJ considered Mr. Chance's knee impairment. He noted that "the medical evidence of record fails to establish the existence of a left knee impairment" after the alleged disability onset date of January 2014.[218] He also noted that regarding Mr. Chance's right knee, "his allegation that this condition causes disabling knee pain is not supported by objective evidence, his treatment seeking behavior, or consistent and significant examination findings."[219] Specifically, the ALJ considered Mr. Chance's two right knee surgeries in February and October 2012.[220] The ALJ also noted that treatment records after mid-2013 do not include regular treatment for knee pain or related symptoms.[221]

ALJ Hebda determined that regarding Mr. Chance's left shoulder, "the medical evidence of record does not include radiographic or other objective evidence of a left shoulder impairment."[222] Mr. Chance argues that the ALJ's decision "fails to comprehend

---

[217] *See Medlock v. Colvin,* No. 15-cv-9609-KK, 2016 WL 6137399, at *5 (C.D. Cal. Oct. 20, 2016) (emphases omitted); *Sisco v. Colvin,* No. 13-cv-01817-LHK, 2014 WL 2859187, at *8 (N.D. Cal. June 20, 2014); *Burch v. Barnhart,* 400 F.3d 676, 684 (9th Cir. 2005) (finding ALJ's decision not to include plaintiff's impairment in VE hypothetical or RFC determination was proper because there was no evidence plaintiff's impairment caused any functional limitations).

[218] A.R. 27.

[219] A.R. 29.

[220] A.R. 29, 430–34, 757–59.

[221] A.R. 30.

[222] A.R. 33.

or to apply the regulatory definition of 'signs' as a component of 'objective medical evidence.'"[223]  However, on physical examination of Mr. Chance's upper extremities, Dr. Klimow noted "decreased range of motion for abduction of the left shoulder when compared to the right," but also noted there was "no evidence of impingement."  Further, Mr. Chance reported to Dr. Klimow that he was unable to return to work due to low back and right elbow pain, not shoulder pain.  He reported "some left shoulder discomfort with limited range of motion in this area."[224]

The ALJ also considered opinion evidence.  ALJ Hebda gave Dr. Backlund's lifting and carrying, stooping, kneeling, crouching, and crawling opinions "great weight," but also found Mr. Chance was more limited in his upper and lower extremities than Dr. Backlund opined.[225]  He considered Dr. Klimow's findings that Mr. Chance had a right knee range of motion that was nearly normal in February 2015.[226]  He also considered Dr. Klimow's "abnormal findings associated with [Mr. Chance]'s left shoulder" and the "subsequent treatment records suggest[ing] possible shoulder impingement."  The ALJ noted that although it was not clear the shoulder impairment met the durational requirement, he included limitations in the RFC to accommodate a left shoulder impairment.[227]

---

[223] Docket 13 at 19.

[224] A.R. 175–79.

[225] A.R. 31.

[226] A.R. 175–79.

[227] A.R. 34.

Here, the ALJ adequately considered Mr. Chance's knee and shoulder limitations in determining the RFC. Substantial evidence in the record supports the ALJ's RFC decision.

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are free from legal error and supported by substantial evidence. Accordingly, IT IS ORDERED that Mr. Chance's request for relief at Docket 13 is DENIED and the Commissioner's final decision is AFFIRMED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 18th day of December, 2018 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE